**[J-4-2024] [MO: Mundy, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

IN RE: THE THIRTIETH COUNTY
INVESTIGATING GRAND JURY

: No. 15 EM 2022
:
: Appeal from the Order of the
: Philadelphia County Court of
: Common Pleas, Trial Division, dated
: March 4, 2022, at Misc. No.
: 0008094-2018
:
: ARGUED: March 6, 2024

**CONCURRING OPINION**

**JUSTICE McCAFFERY**                               **DECIDED: October 24, 2024**

While I ultimately agree with the result reached by the Majority, I write separately to emphasize certain details and highlight my concerns about how grand juries fit into our modern criminal justice system. I will start with my concerns about the Majority's analysis.

First, on the issue of whether the report addresses "public corruption[,]" the Majority properly focuses on "unlawful activity" under the statutory definition of public corruption. However, there is no attempt to define "unlawful" or "unlawful activity[,]" both of which are defined in Black's Law Dictionary. Perhaps this is intentional, as Black's contains three distinct definitions: "1. Not authorized by law; illegal… . 2. Criminally punishable… . 3. Involving moral turpitude." The Majority appears to be focusing on definition 1 or possibly 2, but even definition 1 may be broader than the Majority's construction. For example, some police actions may not be "authorized by law" or "illegal" but not be criminal in nature (*i.e.*, an unauthorized search of a vehicle). Further, definition 3 would certainly be broader than the Majority's construction would permit. Similar problems arise with Black's definition of "unlawful act[:] Conduct that is not authorized by

law; a violation of a civil or criminal law." Finally, none of this addresses the question of whether something like civil negligence is "unlawful."

Nevertheless, I do believe that when read in the context of the Investigating Grand Jury Act as a whole, and Sections 4543 and 4544 in particular, the term "unlawful" should be limited to criminal acts, as those sections reflect investigative grand juries should only be convened to investigate criminal activity.

My larger concern with the Majority's construction of "unlawful activity" arises from its application of that rule to this Report. While the Majority correctly observes that the Report does not explicitly identify any "law" (as opposed to a Police Directive, which I conclude is best classified as a term of employment) that was violated, this is placing a possibly unnecessary burden on a document which is supposedly authored by an independent body of laypersons.

For instance, the Report applies conjecture to surmise that certain injuries may have occurred. In most other criminal contexts, these types of statements would be viewed in a common-sense manner to refer to at least the crime of assault, and perhaps some form of manslaughter or murder. Perhaps the Majority's higher bar of explicit reference to a "law" is justified for grand jury reports, but the Majority makes no attempt to explain that justification.

The Majority has similar problems in addressing the issue of whether the Report recommends government action. As even the Majority concedes, the Report does explicitly contain such recommendations. First, under subsection "A," the Report recommends that the police (an executive department) mandate documentation in situations where Internal Affairs declines to investigate a use-of-force incident beyond the submitted paperwork. These documents would be used to create statistical reports on the issue that would be available for the public. Such documents should be retained "for

a reasonable length of time and subject to audit by an outside agency, one not beholden to the reputational or financial incentives of PPD or other City Agencies." Report at 102. The Report further recommends that this outside agency not be the District Attorney's Office. I find it difficult to categorize this first recommendation as anything other than a recommendation for executive action in the public interest. It does not focus on meting out punishment or assigning blame – it does not name any individual or even imply any criticism of any individual. It merely recommends a change in policy, whether one agrees with it is another issue entirely.

In subsection "B[,]" the Report makes a forceful request for the involvement of independent agencies when suspicious or sudden deaths occur in the custody of law enforcement personnel. Here, the Report at least implies some criticism of certain police officials, though none are named:

> These outside alternatives are no doubt unpalatable to many. However, when the Medical Examiner requested investigative documents from IAD and received none, she apparently had no recourse. There should be a method of lodging a complaint with the PPD when such obstruction takes place. The difficulty, of course, is that the natural place to route such a complaint would be the leadership of the IAD. This case demonstrates why a well-monitored alternative must exist.

Report at 103. While this is perhaps a closer call than subsection "A," it still is not really a close call. This is not "meting out punishment or blame," but rather a call for implementation of new policies in the executive department of city government.

Subsection "C" is certainly more amenable to the Majority's conclusion. It is titled "A Toxic Culture of Quiet Fixes and Damage Control." As difficult as it is to classify Subsections A and B as "meting out punishment and blame," it is equally difficult to classify Subsection C as anything other than "meting out blame." It focuses almost exclusively on the facts of this case, with a faint nod here and there to broader

implications. So, I cannot fault the Majority's conclusion with regard to subsection C on its own.

But this begs the question of whether subsection C necessarily outweighs A and B when defining whether the Report as a whole provides recommendations for legislative, executive, or administrative actions in the public interest. The Majority's opinion is very cursory and makes no attempt to provide a true analysis of this question. In *Investigation No. 18*, 224 A.3d 326 (Pa. 2020), Chief Justice Baer came to a similar conclusion about a report concerning "allegations of prior sexual abuse by [Petitioner] upon numerous children over the past 40 years… ." He concluded the report was not a "Report" under the Act because the recommendations in that report focused "**exclusively** on: (1) punishing a specific person for alleged criminal conduct for which the person cannot be tried due to the running of the relevant statutes of limitation; and (2) providing resources and catharsis to the victims of these alleged crimes." *Id.* at 332 (emphasis added). While the Majority proclaims that this case is the same, I cannot agree that the recommendations in this Report focus **exclusively** on punishment or catharsis for the victim's family. As such, *Investigation No. 18* is not directly on point. That does not mean the result necessarily changes, but this Court must set forth a new rule for analyzing how much focus on punishment, other than an **exclusive** focus, is enough to disqualify the Report in its entirety as a "report" under the Act. Under the Majority's opinion, judges presiding over investigating grand juries have no guidance as to how to classify a document that both provides catharsis to victims and recommends public policy responses.

Turning to the analysis of the question of how much criticism entitles a named, unindicted individual to due process rights, I once again conclude that the Majority's analysis is lacking in thoroughly addressing these important implications. While the

Majority's conclusion – that any criticism is sufficient – seems admirable in isolation, a moment's reflection leads to some obvious problems. First, we must acknowledge that criticism is often in the eye of the beholder. For example, some people might consider being named as socializing with mobsters, even with no connection to the criminality, as criticism. Or, more directly relevant, a subordinate who is criticized in the testimony of supervisors, that are themselves criticized by the report, may still see himself as criticized by the report. I predict that supervising judges will simply take the path of least resistance – if you are named in the report but not indicted, you will receive notice and an opportunity to respond. This may be the right answer in any event, but I think this response should be acknowledged as the likely result and some attempt should be made at weighing the attendant tradeoffs.

Nonetheless, I agree with the Majority that, by any objective measure, some individuals were criticized in this report and did not have notice of the criticism or an opportunity to respond. Further, I conclude that, in this particular case, the DAO failed to establish the Report qualifies as an "investigative grand jury report" under the IGJA. Accordingly, I agree with the Majority that this report should be sealed.

Turning to some of the "big picture" issues I have with the place of the grand jury in the modern criminal justice system, I note there are a multitude of criticisms and law review articles concerning modern grand juries. Most of these criticisms start with the premise that the modern grand jury would be unrecognizable to colonial and revolutionary era citizens. Back then, there were no professionalized police and no equivalent of modern district attorneys.

Instead, victims of crime would present their cases to a grand jury, who would then either authorize or prohibit the victim to file criminal charges against the defendant. Such grand juries were generally local citizens with knowledge of the people involved, and

therefore were considered an independent body applying the community's common sense to the decisions. This form of grand jury was very popular among the revolutionary generation, since the grand juries of that era tended to disallow criminal charges related to sedition that the British crown tried to file, even though the jury was generally well aware that the defendant had, in fact, committed the crimes charged. In this respect, the high esteem of the revolutionary generation for grand juries arose primarily from the grand juries' exercise of the power of jury nullification, as opposed to any fact-finding or fact-based decisions. Thus, the jury's independence from the rest of the government was integral to its reputation for being "a bulwark of liberty."

In contrast, in the 20th Century, it is common to hear the phrase "prosecutors can use a grand jury to indict a ham sandwich." The grand jury may no longer be considered an independent entity with knowledge of the people and circumstances. To the contrary, it is often totally dependent on the information fed to it by the prosecutor who has convened it. Nor is the jury really equipped to exercise its right to nullify technically valid charges. It is in no sense independent from the prosecutor – it is in fact a tool that prosecutors can use to expand their powers beyond that which they otherwise are entitled under the Constitution. At worst, grand juries act as a shield for prosecutors to hide behind if they do not want to prosecute – just present a poor case to the grand jury, and when it fails to indict, shift the blame for the decision to grand jury.

As early as the 1960s, judges and defense counsel recognized this radical shift in the nature of grand juries. Preliminary hearings were instituted to generally replace the grand jury function to make sure the worst of prosecutorial abuses were abated. In 1993, Pennsylvania abolished indicting grand juries entirely. However, they were re-instituted in 2012 after problems in Philadelphia with witness intimidation at preliminary hearings, but explicitly limited to those situations where intimidation was a plausible concern.

One law review article, "The Useful, Dangerous Fiction of Grand Jury Independence," 41 Am. Crim. L. Rev. 1 (2004), lays out these contrasts between original and modern grand juries, but mostly in the federal context, where grand juries must be used to gain an indictment for felonies under the U.S. Constitution. Most interestingly, the law review article suggests dropping the fiction about grand juries being "a bulwark of liberty," and instead recognize them for what they currently are — a sometimes necessary investigative tool for prosecutors. When viewed in this light, reform proposals become somewhat easier to digest. Reform efforts should focus on ensuring a grand jury's ability to uncover evidence and weigh it against individual rights that might be violated through the exercise of the grand jury's powers. Further, grand juries should be limited to those cases requiring their expanded powers, and not used simply as a crutch for prosecutors looking for a shortcut. To the extent that the idea of an independent grand jury remains a policy goal, reforms such as allowing a grand jury to hire its own independent solicitor may be a path forward.

I acknowledge that these concerns do not lead directly to any conclusions in this matter. However, given the ongoing discussion of the proper use of grand juries, I believe it important to clarify that the modern grand jury, whether indicting or investigating, is simply a tool of the prosecutor, no more, no less. In the hands of an agenda driven prosecutor, reputations may be destroyed, rights disregarded and policy recommendations promoted, all at the expense of individuals called upon to answer a grand jury summons. Compounding this dilemma is the fact that lives may be ruined and reputations destroyed with no accountability since under our current law, prosecutors enjoy immunity for all such behavior with little or no accountability. A realistic legal approach to grand juries must keep this in mind.